BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JONATHAN ALLEN, Derivatively on Behalf of CARIBOU BIOSCIENCES, INC.,

Plaintiff,

v.

SCOTT BRAUNSTEIN, ANDREW GUGGENHIME, RACHEL HAURWITZ, DAVID JOHNSON, JASON O'BYRNE, DARA RICHARDSON-HERON, NATALIE SACKS, NANCY WHITING, and RAN ZHENG,

Defendants,

and

CARIBOU BIOSCIENCES, INC.,

Nominal Defendant.

Case No. ___________________

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Jonathan Allen ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Caribou Biosciences, Inc. ("Caribou" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon*, inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, conference call transcripts and public announcements, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Caribou, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Caribou against certain officers and members of the Company's Board for breaches of their fiduciary duties and other violations of law from July 14, 2023 through July 16, 2024, inclusive (the "Relevant Period"), as set forth below.

2. Caribou describes itself as a clinical-stage CRISPR genome-editing biopharmaceutical company dedicated to developing transformative therapies for patients with devastating diseases.

3. The Company's genome-editing platform, including its Cas12a chRDNA technology, enables superior precision to develop cell therapies that are armored to potentially improve activity against disease.

4. Caribou is advancing a pipeline of off-the-shelf cell therapies from its CAR-T platform to offer broad access and rapid availability of treatments for patients with hematologic malignancies and autoimmune diseases.

5. According to its public filings, the Company's products include the following:

a. CB-010: CB-010 is a product candidate from Caribou's allogeneic CAR-T cell therapy platform and is being evaluated in patients with relapsed or refractory B cell non-Hodgkin

lymphoma ("r/r B-NHL") in the ongoing ANTLER Phase 1 clinical trial and in patients with lupus nephritis ("LN") and extrarenal lupus ("ERL") in the GALLOP Phase 1 clinical trial. To Caribou's knowledge, CB-010 is the first allogeneic CAR-T cell therapy in the clinic with a PD-1 knockout, a genome-editing strategy designed to enhance CAR-T cell activity by limiting premature CAR-T cell exhaustion. The United States Food and Drug Administration ("FDA") granted CB-010 Regenerative Medicine Advanced Therapy ("RMAT") and Orphan Drug designations for B-NHL and Fast Track designations for both B-NHL and refractory systemic lupus erythematosus ("SLE").

b. CB-011: CB-011 is a product candidate from Caribou's allogeneic CAR-T cell therapy platform and is being evaluated in patients with relapsed or refractory multiple myeloma ("r/r MM") in the CaMMouflage Phase 1 trial. CB-011 is an allogeneic anti-BCMA CAR-T cell therapy engineered using Cas12a chRDNA genome-editing technology. To Caribou's knowledge, CB-011 is the first allogeneic CAR-T cell therapy in the clinic that is engineered to enable activity through an immune cloaking strategy with a B2M knockout and insertion of a B2M–HLA-E fusion protein to blunt immune-mediated rejection. CB-011 has been granted Fast Track and Orphan Drug designations by the FDA.

c. CB-012: CB-012 is a product candidate from Caribou's allogeneic CAR-T cell therapy platform and is being evaluated in the AMpLify Phase 1 clinical trial in patients with relapsed or refractory acute myeloid leukemia ("r/r AML"). CB-012 is an anti-CLL-1 CAR-T cell therapy engineered with five genome edits, enabled by Caribou's patented next-generation CRISPR technology platform, which uses Cas12a chRDNA genome editing to significantly improve the specificity of genome edits. To Caribou's knowledge, CB-012 is the first allogeneic CAR-T cell therapy with both checkpoint disruption, through a PD-1 knockout, and immune cloaking, through a B2M knockout and B2M–HLA-E fusion protein insertion; both armoring strategies are designed to enhance activity. Caribou has exclusively in-licensed from Memorial Sloan Kettering Cancer Center in the field of allogeneic CLL-1-targeted cell therapy a panel of fully human scFvs targeting CLL-1, from which the company has selected a scFv for the generation of the company's CAR. CB-012 was granted Fast Track and Orphan Drug designations by the FDA.

6. As alleged herein, during the Relevant Period, the Individual Defendants issued and/or caused Caribou to issue materially false and misleading statements that made CB-010 appear to be equally as safe, effective, and durable as CAR-T cell. However, Caribou was at risk of not having sufficient cash, liquidity, or other capital.

7. On July 13, 2023, Caribou filed a preliminary Form 424B5 with the SEC (the "Preliminary 424B5") in connection with Caribou's forthcoming public offering (the "Offering").

8. The Preliminary 424B5 provided:

> We currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents, and marketable securities, to fund . . . preclinical development of our CB-020 product candidate. . . .
>
> Our management will have broad discretion in the application of the net proceeds, if any, from this offering and the amounts and timing of our actual expenditures will depend on numerous factors. . . . As of the date of this prospectus supplement, we cannot predict with certainty all of the particular uses for the net proceeds to be received upon the completion of this offering or the amounts that we will actually spend on the uses set forth above. The amounts and timing of our actual expenditures and the extent of our preclinical, clinical, and future development activities may vary significantly depending on numerous factors, including the progress of our development efforts, the status of and results from our ongoing and planned clinical trials, the timing of regulatory submissions and the outcome of regulatory review, our ability to take advantage of expedited programs or to obtain regulatory approval for product candidates, and the timing and costs associated with the manufacture and supply of our product candidates for clinical development or commercialization, as well as any collaborations that we may enter into with third parties for our product candidates and any unforeseen cash needs. Although we intend to spend the net proceeds of the offering as stated above, circumstances may arise when, for sound business reasons, a re-allocation of funds may be necessary or advisable.

9. Then on July 16, 2024, Caribou disclosed that the Company would be reducing its workforce by about twelve percent and would no longer be continuing its preclinical research on the allogeneic CARN-NK platform to "extend its cash runway."

10. Following this news, Caribou's stock price dropped by approximately 3.3 percent, or by $0.09 per share, from a close of $2.73 per share on July 16, 2024 to a close of $2.64 per share the following day.

11. As a result of the foregoing and as set forth in greater detail herein, a securities fraud class action was filed against the Company, captioned *Saylor v. Caribou Biosciences, Inc.*, No. 3:24-cv-09413 (N.D. Cal.) (the "Securities Class Action"). The Securities Class Action has caused, and will continue to cause, Caribou to expend significant funds to defend itself against the claims asserted in that action, and exposed the Company to massive potential class-wide liability.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

13. Plaintiff's claims also raise a federal question regarding the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, and the Securities Class Action is pending in this District.

## PARTIES

***Plaintiff***

17. Plaintiff is, and has been at all relevant times, a shareholder of Caribou.

***Nominal Defendant***

18. Nominal Defendant Caribou is a Delaware corporation with corporate headquarters located at 2929 7th Street, Suite 105, Berkeley, California 94710. Caribou's common stock trades on

the NASDAQ under the ticker symbol "CRBU."

***Individual Defendants***

19. Defendant Scott Braunstein ("Braunstein") has served as a member of the Board of Caribou since June 2021. Braunstein is the Chairperson of the Compensation Committee. Braunstein is also a member of the Audit Committee.

20. Defendant Andrew Guggenhime ("Guggenhime") has served as a member of the Board of Caribou since April 2021. Guggenhime is the Chairperson of the Audit Committee. Guggenhime is also a member of the Compensation Committee.

21. Defendant Rachel Haurwitz ("Haurwitz") has served as Chief Executive Officer ("CEO"), President, and a member of the Board of Caribou since October 2011.

22. Defendant David Johnson ("Johnson") has served as a member of the Board of Caribou since May 2022. Johnson is a member of the Audit Committee.

23. Defendant Jason O'Byrne ("O'Byrne") served as the Chief Financial Officer ("CFO") of Caribou from February 2021 through September 2024.

24. Defendant Dara Richardson-Heron ("Richardson-Heron") has served as a member of the Board of Caribou since November 2021. Richardson-Heron is a member of the Nominating and Corporate Governance Committee.

25. Defendant Natalie Sacks ("Sacks") has served as a member of the Board of Caribou since May 2018. Sacks is the Chairperson of the Nominating and Corporate Governance Committee. Sacks is also a member of the Science and Technology Committee.

26. Defendant Nancy Whiting ("Whiting") has served as a member of the Board of Caribou since August 2021. Whiting is the Chairperson of the Science and Technology Committee. Whiting is also a member of the Compensation Committee.

27. Defendant Ran Zheng ("Zheng") has served as a member of the Board of Caribou since September 2021. Zheng is a member of the Nominating and Corporate Governance Committee as well as the Science and Technology Committee.

28. Defendants referenced in paragraphs 19 through 27 are herein referred to as the "Individual Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

29. By reason of their positions as officers and/or directors of Caribou, and because of their ability to control the business and corporate affairs of Caribou, the Individual Defendants owed Caribou and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Caribou in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Caribou and its shareholders.

30. Each director and officer of the Company owes to Caribou and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Caribou, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32. To discharge their duties, the officers and directors of Caribou were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Caribou, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35. To discharge their duties, the officers and directors of Caribou were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Caribou were required to, among other things: (i) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Caribou's own Code of Business Conduct, Scientific and Data Integrity, and Ethics (the "Code of Conduct"); (ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (iii) remain informed as to how Caribou conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; (iv) establish and maintain systematic and accurate records and reports of the business and internal affairs of Caribou and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records; (v) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Caribou's operations would comply with all applicable laws and Caribou's financial statements and regulatory filings filed with the SEC and disseminated to

the public and the Company's shareholders would be accurate; (vi) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; (vii) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and (viii) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36. Each of the Individual Defendants further owed to Caribou and the shareholders the duty of loyalty requiring that each favor Caribou's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37. At all times relevant hereto, the Individual Defendants were the agents of each other and of Caribou and were at all times acting within the course and scope of such agency.

38. Because of their advisory, executive, managerial, and directorial positions with Caribou, each of the Individual Defendants had access to adverse, non-public information about the Company.

39. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Caribou.

## CARIBOU'S CODE OF CONDUCT

40. Caribou's Code of Conduct provides:

> Caribou Biosciences, Inc. (the "Company," "us," "we," "our") is committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct, Scientific and Data Integrity, and Ethics (this "Code") reflects the business practices and principles of behavior that support this commitment. This Code applies to every employee, consultant, contractor, and director of the Company and we require each such person to read and understand this Code and its application to the performance of their business responsibilities.
>
> All officers and managers are expected to demonstrate, and instill in our employees, consultants, and contractors, a commitment to the spirit, as well as the letter, of this

Code. Managers are also expected to ensure that all employees reporting to them, as well as consultants and contractors performing services for the Company, conform to this Code. Nothing in this Code alters an employee's employment relationship with the Company.

This Code addresses conduct that is particularly important to proper dealings with the people and entities with whom we interact, but reflects only a part of our commitment. From time to time, we may adopt additional policies and procedures with which our employees, consultants, contractors, and directors are expected to comply, if applicable to them. However, it is the responsibility of each employee, consultant, contractor, and director to apply reasonable judgment, together with their own highest personal ethical standards, in making business decisions where there is no stated guideline in this Code.

41. The Code of Conduct further provides:

It is the policy of the Company to promote high standards of integrity by conducting our business in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness, and integrity brought to the job by each person. Unyielding personal integrity is the foundation of corporate integrity. . . .
Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee, consultant, contractor, and director operating within legal guidelines and cooperating with local, state, federal, and international authorities. We expect employees, consultants, contractors, and directors to understand the legal and regulatory requirements applicable to their areas of responsibility. . . .
We expect employees, consultants, contractors, and directors to comply with all such laws and regulations. We may hold periodic training sessions to ensure that all employees comply with the relevant laws, rules, and regulations associated with their employment and areas of responsibility, including laws prohibiting insider trading (which are discussed in further detail in Section 3). If you have a question in the area of legal compliance, it is important that you seek answers from your manager, Human Resources, or the Compliance Officer (as described in Section 17).

42. Moreover, the Code of Conduct states:

The integrity of our records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records must be accurate. The making of false or misleading entries, whether they relate to financial results or otherwise, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to our stakeholders. As a result, it is important that our books, records, and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs, and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;
- the terms of sales, if applicable, and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
- employees comply with our system of internal controls; and
- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders, and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosure and fairly present our financial condition and results of operations. Employees, consultants, contractors, and directors who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to 7 assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.

**CARIBOU'S AUDIT COMMITTEE CHARTER**

43. Caribou's Audit Committee is governed by its Audit Committee Charter.

44. As set forth in the Audit Committee Charter:

The purpose of the Audit Committee (the "Committee") of the board of directors (the "Board") of Caribou Biosciences, Inc. (the "Company") is to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to (1) the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting, and audits of financial statements and systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports, (2) the qualifications, independence, and performance of the Company's registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services, (3) reviewing any reports or other disclosure required by the applicable rules and regulations of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein, and (4) the performance of the Company's internal audit function, if any.

> The primary role of the Committee is to oversee the financial reporting and disclosure process. To fulfill this obligation, the Committee relies on management for the preparation and accuracy of the Company's financial statements; management for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures, and applicable laws and regulations; and the Company's independent auditors for an unbiased, diligent audit or review, as applicable, of the Company's financial statements and the effectiveness of the Company's internal controls (to the extent applicable). The members of the Committee are not employees of the Company and are not responsible for conducting the audit or performing other accounting procedures.

45. The Audit Committee Charter further provides, in a section titled "Duties and Responsibilities":

> J. To review with management and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting, and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls, and procedures, and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls, and procedures, and review and discuss with management and the Company's independent auditors any disclosure relating to the Company's financial reporting processes, internal control over financial reporting, and disclosure controls and procedures, and, to the extent applicable, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.
>
> K. To review and discuss with the Company's independent auditors any other matters required to be discussed by applicable requirements of the PCAOB and the SEC.
>
> L. To review and discuss with the Company's independent auditors and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the auditors on the financial statements, and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual reports on Form 10-K before the annual reports are filed.
>
> M. To recommend to the Board that the audited financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" be included in the Company's annual report on Form 10-K and whether the annual report on Form 10-K should be filed with the SEC; and to produce the audit committee report required to be included in the Company's proxy statement.

N. To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly reports on Form 10-Q before the quarterly reports are filed.

O. To review with management and the Company's independent auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion. . . .

R. To review and discuss with management the risks faced by the Company and the policies, guidelines, and processes by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risk exposures, and the steps management has taken to monitor and control such exposures.

S. To monitor compliance with the Company's Code of Business Conduct, Scientific and Data Integrity, and Ethics (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code. Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board. The Committee will review and reassess the adequacy of this Code at least annually, and recommend to the Board any changes the Committee determines are appropriate. . . .

U. To review, with the Chief Legal Officer and, as applicable, outside legal counsel, certain legal and regulatory matters, including legal cases against or regulatory investigations of the Company and its subsidiaries that could have a significant impact on the Company's financial statements.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company***

46. Caribou describes itself as a clinical-stage CRISPR genome-editing biopharmaceutical company dedicated to developing transformative therapies for patients with devastating diseases.

47. The Company's genome-editing platform, including its Cas12a chRDNA technology, enables superior precision to develop cell therapies that are armored to potentially improve activity against disease.

48. Caribou is advancing a pipeline of off-the-shelf cell therapies from its CAR-T platform to offer broad access and rapid availability of treatments for patients with hematologic malignancies and autoimmune diseases.

49. According to its public filings, the Company's products include the following:

a. CB-010: CB-010 is a product candidate from Caribou's allogeneic CAR-T cell therapy platform and is being evaluated in patients with r/r B-NHL in the ongoing ANTLER Phase 1 clinical trial and in patients with LN and ERL in the GALLOP Phase 1 clinical trial. To Caribou's knowledge, CB-010 is the first allogeneic CAR-T cell therapy in the clinic with a PD-1 knockout, a genome-editing strategy designed to enhance CAR-T cell activity by limiting premature CAR-T cell exhaustion. The FDA granted CB-010 RMAT and Orphan Drug designations for B-NHL and Fast Track designations for both B-NHL and refractory SLE.

b. CB-011: CB-011 is a product candidate from Caribou's allogeneic CAR-T cell therapy platform and is being evaluated in patients with r/r MM in the CaMMouflage Phase 1 trial. CB-011 is an allogeneic anti-BCMA CAR-T cell therapy engineered using Cas12a chRDNA genome-editing technology. To Caribou's knowledge, CB-011 is the first allogeneic CAR-T cell therapy in the clinic that is engineered to enable activity through an immune cloaking strategy with a B2M knockout and insertion of a B2M–HLA-E fusion protein to blunt immune-mediated rejection. CB-011 has been granted Fast Track and Orphan Drug designations by the FDA.

c. CB-012: CB-012 is a product candidate from Caribou's allogeneic CAR-T cell therapy platform and is being evaluated in the AMpLify Phase 1 clinical trial in patients with r/r AML. CB-012 is an anti-CLL-1 CAR-T cell therapy engineered with five genome edits, enabled by Caribou's patented next-generation CRISPR technology platform, which uses Cas12a chRDNA genome editing to significantly improve the specificity of genome edits. To Caribou's knowledge, CB-012 is the first allogeneic CAR-T cell therapy with both checkpoint disruption, through a PD-1 knockout, and

immune cloaking, through a B2M knockout and B2M–HLA-E fusion protein insertion; both armoring strategies are designed to enhance activity. Caribou has exclusively in-licensed from Memorial Sloan Kettering Cancer Center in the field of allogeneic CLL-1-targeted cell therapy a panel of fully human scFvs targeting CLL-1, from which the company has selected a scFv for the generation of the company's CAR. CB-012 was granted Fast Track and Orphan Drug designations by the FDA.

***Materially False and Misleading Statements***

50. On July 13, 2023, Caribou filed the Preliminary 424B5 with the SEC in connection with the Offering.

51. The Preliminary 424B5 provided:

> We currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents, and marketable securities, to fund . . . preclinical development of our CB-020 product candidate. . . .
>
> Our management will have broad discretion in the application of the net proceeds, if any, from this offering and the amounts and timing of our actual expenditures will depend on numerous factors. . . . As of the date of this prospectus supplement, we cannot predict with certainty all of the particular uses for the net proceeds to be received upon the completion of this offering or the amounts that we will actually spend on the uses set forth above. The amounts and timing of our actual expenditures and the extent of our preclinical, clinical, and future development activities may vary significantly depending on numerous factors, including the progress of our development efforts, the status of and results from our ongoing and planned clinical trials, the timing of regulatory submissions and the outcome of regulatory review, our ability to take advantage of expedited programs or to obtain regulatory approval for product candidates, and the timing and costs associated with the manufacture and supply of our product candidates for clinical development or commercialization, as well as any collaborations that we may enter into with third parties for our product candidates and any unforeseen cash needs. Although we intend to spend the net proceeds of the offering as stated above, circumstances may arise when, for sound business reasons, a re-allocation of funds may be necessary or advisable.

52. On July 14, 2023, Caribou filed a finalized Form 424B5 with the SEC in connection with the Offering (the "Final 424B5").

53. The Final 424B5 similarly provided:

> We currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents, and marketable securities, to fund . . . preclinical development of our CB-020 product candidate. . . .

> Our management will have broad discretion in the application of the net proceeds, if any, from this offering and the amounts and timing of our actual expenditures will depend on numerous factors. . . . As of the date of this prospectus supplement, we cannot predict with certainty all of the particular uses for the net proceeds to be received upon the completion of this offering or the amounts that we will actually spend on the uses set forth above. The amounts and timing of our actual expenditures and the extent of our preclinical, clinical, and future development activities may vary significantly depending on numerous factors, including the progress of our development efforts, the status of and results from our ongoing and planned clinical trials, the timing of regulatory submissions and the outcome of regulatory review, our ability to take advantage of expedited programs or to obtain regulatory approval for product candidates, and the timing and costs associated with the manufacture and supply of our product candidates for clinical development or commercialization, as well as any collaborations that we may enter into with third parties for our product candidates and any unforeseen cash needs. Although we intend to spend the net proceeds of the offering as stated above, circumstances may arise when, for sound business reasons, a re-allocation of funds may be necessary or advisable.

54. On August 8, 2023, the Individual Defendants caused Caribou to issue a press release, wherein the Company announced its 2023 second quarter financial results.

55. In the press release, Individual Defendant Haurwitz commented:

> In 2023, we have advanced our programs to build value across the pipeline and position Caribou for continued momentum ahead . . . . For our lead program, we are excited by the positive CB-010 dose escalation data demonstrating response rates that rival those from the approved autologous CAR-T cell therapies.

56. The press release further disclosed that: (i) "69% of patients (11 of 16) achieved a complete response (CR)"; (ii) "44% of patients (7 of 16) had a CR at ≥6 months" with "24 months [being] the longest CR maintained to date"; and (iii) "[f]or the subset of patients with large B cell lymphoma (LBCL) (N=10) . . . 70% (7 of 10) achieved a CR" and "50% (5 of 10) had a CR at ≥6 months" with "18 months [being] the longest CR maintained to date."

57. Moreover, the press release provided: "Caribou had $292.5 million in cash, cash equivalents, and marketable securities as of June 30, 2023," which "does not include the approximately $134.6 million in net proceeds from the Company's underwritten public offering completed in the third quarter of 2023."

58. The press release further stated: "Caribou expects its cash, cash equivalents, marketable

securities, and net proceeds from the recent public offering will be sufficient to fund its current operating plan into Q4 2025."

59. On August 8, 2023, the Individual Defendants caused Caribou to file a Form 10-Q with the SEC (the "August 2023 Form 10-Q") in connection with the 2023 second quarter results, which was signed by Individual Defendants Haurwitz and O'Byrne. The August 2023 Form 10-Q further contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and Rules 13a-14(a) and 15(d)-14(a) of the Exchange Act, also signed by Haurwitz and O'Byrne.

60. The August 2023 Form 10-Q provided: "Our management expects that existing cash, cash equivalents, and marketable securities of $292.5 million as of June 30, 2023, will be sufficient to fund our current operating plan for at least the next 12 months from the date of issuance of our condensed consolidated financial statements."

61. On November 7, 2023, the Individual Defendants caused Caribou to issue a press release, wherein the Company announced its 2023 third quarter financial results.

62. In the press release, Individual Defendant Haurwitz commented: "In 2023, we have advanced our programs to build value across the pipeline and position Caribou as a leader in the allogeneic CAR-T cell therapy space. . . . With two years of cash and continued financial discipline, we are well positioned to execute on our current programs and continue Caribou's momentum."

63. The press release further stated: "Caribou continues to enroll second-line LBCL patients in the dose expansion portion of the ongoing ANTLER Phase 1 clinical trial based on positive data from the dose escalation portion of the trial."

64. Moreover, the press release disclosed: "Caribou had $396.7 million in cash, cash equivalents, and marketable securities as of September 30, 2023," which "Caribou expects . . . will be sufficient to fund its current operating plan into Q4 2025."

65. On November 7, 2023, the Individual Defendants caused Caribou to file a Form 10-Q with the SEC (the "November 2023 Form 10-Q") in connection with the 2023 third quarter results, which was signed by Individual Defendants Haurwitz and O'Byrne. The November 2023 Form 10-Q further contained signed certifications pursuant to the SOX, also signed by Haurwitz and O'Byrne.

66. The November 2023 Form 10-Q provided: “Our management expects that existing cash, cash equivalents, and marketable securities of $396.7 million as of September 30, 2023, will be sufficient to fund our current operating plan for at least the next 12 months from the date of issuance of our condensed consolidated financial statements.”

67. On March 11, 2024, the Individual Defendants caused Caribou to issue a press release, wherein the Company announced its 2023 fourth quarter and full year financial results.

68. The press release provided: “As previously reported, CB-010 demonstrated encouraging data from the dose escalation portion of the ANTLER Phase 1 clinical trial in 16 patients with [r/r B-NHL],” and “[d]ose escalation data showed CB-010 has the potential to rival the efficacy and safety profile of approved autologous CAR-T cell therapies.”

69. The press release further disclosed that “Caribou had $372.4 million in cash, cash equivalents, and marketable securities as of December 31, 2023,” which “Caribou expects . . . will be sufficient to fund its current operating plan into Q1 2026.”

70. On March 11, 2024, the Individual Defendants caused Caribou to file a Form 10-K with the SEC (the “Form 10-K”) in connection with the 2023 financial results, which was signed by Individual Defendants Braunstein, Guggenhime, Haurwitz, Richardson-Heron, Johnson, O’Byrne, Sacks, Whiting, and Zheng. The Form 10-K further contained signed certifications pursuant to the SOX, signed by Haurwitz and O’Byrne.

71. The Form 10K disclosed: “Safety results from patients at all three dose levels [in the ANTLER Phase 1 clinical trial] showed CB-010 was generally well-tolerated with adverse events (‘AEs’) consistent with autologous . . . anti-CD19 CAR-T cell therapies.”

72. Moreover, the Form 10-K provided “that [Caribou’s] existing cash, cash equivalents, and marketable securities of $372.4 million as of December 31, 2023, will be sufficient to fund our current operating plan for at least the next 12 months from the date of issuance of our consolidated financial statements.”

73. On April 25, 2024, the Individual Defendants caused Caribou to file a proxy statement with the SEC (the “2024 Proxy”).

74. The 2024 Proxy disclosed that an annual meeting of stockholders was being held on June 13, 2024, for the following purposes:

> (1) To elect Rachel Haurwitz, Ph.D., Dara Richardson-Heron, M.D., and Natalie Sacks, M.D., as Class III Directors, each to serve until the 2027 annual meeting of stockholders and until their respective successor is duly elected and qualified or until their earlier death, resignation, or removal;
>
> (2) To ratify the appointment of Deloitte & Touche LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2024; and
>
> (3) To transact such other business as may properly come before the 2024 Annual Meeting or any continuations, adjournments, or postponements thereof.

75. Regarding Items 1 and 2 above, the 2024 Proxy contained the following Board recommendations:

> Our Board recommends that you vote:
>
> "FOR" the election of Rachel Haurwitz, Ph.D., Dara Richardson-Heron, M.D., and Natalie Sacks, M.D., as Class III Directors (Proposal 1); and
>
> "FOR" the ratification of the appointment of Deloitte & Touche LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2024 (Proposal 2).

76. The 2024 Proxy provided, in a section titled "Code of Business Conduct, Scientific and Data Integrity, and Ethics":

> We have adopted a written Code of Business Conduct, Scientific and Data Integrity, and Ethics ("Code of Conduct") that applies to all of our employees, consultants, contractors, and directors. A current copy of the Code of Conduct is available on the Corporate Governance section of our website at https://investor.cariboubio.com. The audit committee is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for our executive officers and directors. We expect that any amendments to the Code of Conduct, or any waivers of its requirements with respect to our executive officers and directors, will be disclosed on our website at the address indicated above. Our website and the information contained therein or connected thereto shall not be deemed to be incorporated into this proxy statement. We have included our website address as an inactive textual reference only. We will provide to any person, without charge, a copy of the Code of Conduct. Any such request should be directed to Caribou Biosciences, Inc., 2929 7th Street, Suite 105, Berkeley,

> CA 94710, Attn: Chief Legal Officer and Corporate Secretary, telephone: 510-982-6030.

77. Moreover, the 2024 Proxy provided, in a section titled "Role of our Board in Risk Oversight Process":

> Although our officers are responsible for the day-to-day management of risks, our Board has broad oversight responsibility for our Company's risk management programs. Our officers are charged with identifying material risks that we face; implementing strategies to address specific material risk exposures; evaluating risk and risk management with respect to business decision-making throughout our Company; and efficiently and promptly transmitting relevant risk-related information to our Board or appropriate committee, so as to enable them to conduct appropriate risk management oversight.
>
> Our Board performs an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks, and operational risks. The audit committee is responsible for overseeing the management of our major financial risk exposures, including risks relating to accounting matters and financial reporting, legal and compliance risks, and cyber security risks. As part of this oversight, the audit committee receives regular reports from management on such risks at its regularly scheduled meetings, including reports not less than twice per year relating to data privacy and cybersecurity and the actions management has taken to limit, monitor, or control such exposures. The compensation committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. The NCG committee is responsible for overseeing the management of risks associated with the independence of our Board and potential conflicts of interest. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed through discussions from committee members about such risks.

78. The 2024 Proxy was materially false and misleading.

79. Specifically, the 2024 Proxy omitted that: (i) the Individual Defendants overstated the safety, efficacy, and durability of CB-010 compared to CAR-T cell when treating patients r/r B-NHL and/or LBCL; (ii) the Individual Defendants overstated CB-010's overall clinical results and commercial prospects; (iii) the Company was seriously at risk of running out of cash, liquidity, and/or other capital, including preclinical research associated with the allogeneic CAR-NK platform; (iv) Caribou's Code of Conduct was violated; (v) Caribou's Audit Committee was violated; and (vi) the Individual Defendants were not properly fulfilling their risk oversight responsibilities.

80. As a result of the foregoing materially false and misleading statements in the 2024 Proxy, Caribou's stockholders voted to reelect Individual Defendants Haurwitz, Richardson-Heron, and Sacks as directors of Caribou.

81. Furthermore, as a result of the foregoing materially false and misleading statements in the 2024 Proxy, Caribou's stockholders voted to ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

82. On May 7, 2024, the Individual Defendants caused Caribou to issue a press release, wherein the Company announced its 2024 first quarter financial results.

83. The press release provided: "Caribou had $345.9 million in cash, cash equivalents, and marketable securities as of March 31, 2024," which "Caribou expects . . . will be sufficient to fund its current operating plan into Q1 2026."

84. On May 7, 2024, the Individual Defendants caused Caribou to file a Form 10-Q with the SEC (the "May 2024 Form 10-Q") in connection with the 2024 first quarter results, which was signed by Individual Defendants Haurwitz and O'Byrne. The May 2024 Form 10-Q further contained signed certifications pursuant to the SOX, also signed by Haurwitz and O'Byrne.

85. The May 2024 Form 10-Q provided: "Our management expects that existing cash, cash equivalents, and marketable securities of $345.9 million as of March 31, 2024, will be sufficient to fund our current operating plan for at least the next 12 months from the date of issuance of our unaudited condensed consolidated financial statements."

86. On June 2, 2024, the Individual Defendants caused Caribou to issue a press release, wherein the Company announced that, at the 2024 American Society of Clinical Oncology Annual Meeting, the Company "presented updated clinical data from the ongoing ANTLER Phase 1 trial."

87. The press release stated that data purportedly "indicate[d that] a single dose of CB-010 . . . has the potential to rival the safety, efficacy, and durability of approved autologous CAR-T cell therapies."

88. The above-referenced statements were materially false and misleading.

89. Specifically, the Individual Defendants omitted that: (i) they overstated the safety,

efficacy, and durability of CB-010 compared to CAR-T cell when treating patients r/r B-NHL and/or LBCL; (ii) they overstated CB-010's overall clinical results and commercial prospects; and (iii) Caribou was seriously at risk of running out of cash, liquidity, and/or other capital, including preclinical research associated with the allogeneic CAR-NK platform.

***The Truth Begins to Emerge***

90. On June 3, 2024, Evercore issued a report with respect to Caribou's updated clinical data from the ANTLER Phase 1 trial.

91. The report stated that Evercore was downgrading Caribou's stock to "in line."

92. Moreover, Evercore stated that it lowered Caribou's price target from $13.00 to $3.00 per share. Evercore's basis for doing so was that it was "not yet convinced" that Caribou's therapy "will be competitive and wait on the sidelines until data in 1H 2025."

93. Evercore's report further provided:

> [Caribou] may have unlocked the key to allogenic CAR-T. But we are not yet convinced that it will be competitive and wait on the sidelines until data in 1H25. Reducing our rating to In Line and [price target] to $3.
>
> At ASCO this weekend, [Caribou] presented details of the HLA subgroup analysis of the [Phase 1] ANTLER study for its allogenic CD19 CAR-T, CB-010. The idea was to move it closer to its autologous counterparts. The analysis showed patients with HLA match of at least 4 antigens do better than those with lesser or no HLA match. But is it good enough? [Overall response rate] looks strong, but [complete response] and [progression-free survival] still fall behind autologous CAR-T[.] . . .
>
> In this subset of 11 LBCL patients treated with CB-010 in the P1 ANTLER study with at least 4 (max HLA match was 6), ORR was 91%, CR was 36% and 6 month PFS was 53% (suggests 6 months is close to the median (50%) PFS level).
>
> This compares relatively well to autologous CAR-T which achieved 83-86% ORR. But CR for autologous counterparts is in the 65-66% range and median PFS is beyond 14 months. . . .
>
> Overall, efficacy of CB-010 in [second-line] LBCL is not competitive vs autologous CAR-T with lower response rate and much shorter PFS.

94. Evercore's report continued:

> Enhanced lymphodepletion may pose safety risk. The CB-010 trial uses an enhanced lymphodepletion (LD) regimen that is expected to create a larger window for optimal engraftment of the infused cells. However, it also comes with the potential risk for infection and neurotoxicity. Another allogenic cell therapy company, Precision Bio used an enhanced LD protocol in its allogeneic CAR-T trial. Despite encouraging efficacy, the regimen led to multiple deaths and prompted the company to ameliorate the regimen to improve safety . . . . Bears worry that the current safety profile is warranted by careful patient selection in the clinical setting and the enhanced LD may led to serious [adverse events] e.g., deaths in broader patient population. Also, bears wonder how much of the efficacy/durability may be related to the aggressive LD regimen. It's worth noting that this regimen is not used for other [Caribou] programs.
>
> Lead candidates in crowded space. CD19 and BCMA are highly competitive fields for cell therapies. Besides FDA approved CAR-Ts and bispecifics, there are numerous autologous and allogeneic CAR-T programs in development.
>
> Solid tumor is a competitive space. Immunotherapies for solid tumors is a crowded space. We counted 46 cellular and mRNA therapies in clinical development for treatment of solid tumor, including CAR-T, TCR, NK, and TIL., all early stage.

95. Following this news, Caribou's stock price fell about 25.5 percent, or by $0.735 per share, from a close of $2.88 per share on June 2, 2024 to close of $2.145 per share the following day.

96. Then on July 16, 2024, the Individual Defendants caused Caribou to file a Form 8-K with the SEC (the "Form 8-K").

97. The Form 8-K disclosed that Caribou was reducing its workforce by about twelve percent. Moreover, Caribou was pausing preclinical research activities with respect to the CAR-NK platform. The Form 8-K stated:

> On July 16, 2024, the Company discontinued preclinical research activities associated with its allogeneic CAR-NK platform and reduced its workforce by 21 positions, or approximately 12%. The Company is undertaking this reduction to extend its cash runway and focus resources on its allogeneic CAR-T cell therapy platform and on rapidly advancing four oncology and autoimmune disease clinical programs through multiple milestones expected in 2024 and 2025. The Company expects to substantially complete the reduction by the end of the third quarter of 2024. . . .
>
> In connection with the workforce reduction, the Company currently estimates it will incur approximately $0.5 million to $1.0 million in costs, consisting primarily of cash severance costs, benefits, and transition support services for impacted employees, which the Company expects to recognize in the third quarter of 2024.

> The estimates of costs and expenses that the Company expects to incur in connection with the CAR-NK platform discontinuation and workforce reduction are subject to a number of assumptions, and actual results may differ materially. The Company may also incur costs not currently contemplated due to events that may occur as a result of, or that are associated with, this decision.

98. Following this news, Caribou's stock price fell about 3.3 percent, or by $0.09 per share, from a close of $2.73 per share on July 16, 2024 to close of $2.64 per share the following day.

99. Several months later, on September 3, 2024, the Individual Defendants announced that Individual Defendant O'Byrne was resigning as CFO of the Company.

***The Securities Class Action***

100. As a result of the foregoing, the Securities Class Action was filed against the Company, Haurwitz, and O'Byrne, captioned *Saylor v. Caribou Biosciences, Inc.*, No. 3:24-cv-09413 (N.D. Cal.).

101. As a result, Caribou has incurred, and will continue to incur, substantial costs to defend itself in the Securities Class Action, and is exposed to massive potential class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

102. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

103. Caribou is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

104. Plaintiff is a current shareholder of Caribou and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

105. A pre-suit demand on the Board of Caribou is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Braunstein, Guggenhime, Haurwitz, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng.

106. Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

107. The Individual Defendants either knew, or should have known, that the statements they issued, or caused to be issued on the Company's behalf, were materially false and misleading, but they took no steps in a good faith effort to prevent or remedy that situation.

108. Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

109. Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

110. Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

111. Individual Defendants Braunstein, Guggenhime, and Johnson are not disinterested or independent. Braunstein, Guggenhime, and Johnson are members of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Braunstein, Guggenhime, and Johnson knowingly or recklessly allowed the issuance of the aforementioned improper statements.

112. Defendants Richardson-Heron, Sacks, and Zheng are not disinterested or independent. Richardson-Heron, Sacks, and Zheng are members of the Nominating and Corporate Governance

Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company. Defendants Richardson-Heron, Sacks, and Zheng failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above.

113. Individual Defendants Braunstein, Guggenhime, Haurwitz, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng are not disinterested or independent. Braunstein, Guggenhime, Haurwitz, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng caused the issuance of the 2024 Proxy. As alleged above, due to the Individual Defendants' materially false and misleading statements in the 2024 Proxy, the Company's stockholders voted to approve Items 1-2 in the 2024 Proxy, including the election of certain Individual Defendants to the Board and the ratification of the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm. Thus, Braunstein, Guggenhime, Haurwitz, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng are not disinterested or independent, and demand upon them would be futile.

114. Individual Defendants Braunstein, Guggenhime, Haurwitz, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng are not disinterested or independent. Braunstein, Guggenhime, Haurwitz, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng each signed the Form 10-K. As alleged above, the Form 10-K was materially false and misleading. Thus, Braunstein, Guggenhime, Haurwitz, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng are not disinterested or independent, and demand upon them would be futile.

115. Individual Defendant Haurwitz is not disinterested or independent. Haurwitz is CEO of the Company, and she derives substantial compensation from her relationship with the Company. As alleged above, Haurwitz was directly involved in and perpetrated the scheme alleged herein. Haurwitz also signed the Forms 10-Q as well as the SOX certifications set forth above. Moreover, Haurwitz was named as a defendant and, therefore, faces a substantial likelihood of liability, in the Securities Class Action based on substantially the same wrongdoing alleged herein. Thus, Haurwitz is not disinterested or independent.

116. Accordingly, a pre-suit demand on the Board is futile and, therefore, excused.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

117. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

119. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

120. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

122. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

**COUNT II**

**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

125. Plaintiff, on behalf of Caribou, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

126. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Caribou.

128. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Caribou that was tied to the performance or artificially inflated valuation of Caribou, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

129. Plaintiff, as a shareholder and a representative of Caribou, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

130. Plaintiff on behalf of Caribou has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Waste of Corporate Assets**

131. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

133. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

134. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

135. Plaintiff, on behalf Caribou, has no adequate remedy at law.

**COUNT V**

**Against Individual Defendants Haurwitz and O'Byrne for Contribution Under Sections 10(b) and 21D of the Exchange Act**

136. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137. Caribou and Individual Defendants Haurwitz and O'Byrne are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Individual Defendants Haurwitz's and O'Byrne's willful and/or reckless violations of their obligations as officers and/or directors of Caribou.

138. Defendants Haurwitz and O'Byrne, because of their positions of control and authority

as officers and/or directors of Caribou, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Caribou, including the wrongful acts complained of herein and in the Securities Class Action.

139. Accordingly, Defendants Haurwitz and O'Byrne are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

140. As such, Caribou is entitled to receive all appropriate contribution or indemnification from Defendants Haurwitz and O'Byrne.

141. Plaintiff, on behalf Caribou, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)

142. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

144. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781]."

145. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state

any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9

146. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy, which was filed with the SEC.

147. As alleged above, the 2024 Proxy was materially false and misleading because it omitted that: (i) the Individual Defendants overstated the safety, efficacy, and durability of CB-010 compared to CAR-T cell when treating patients r/r B-NHL and/or LBCL; (ii) the Individual Defendants overstated CB-010's overall clinical results and commercial prospects; (iii) the Company was seriously at risk of running out of cash, liquidity, and/or other capital, including preclinical research associated with the allogeneic CAR-NK platform; (iv) Caribou's Code of Conduct was violated; (v) Caribou's Audit Committee was violated; and (vi) the Individual Defendants were not properly fulfilling their risk oversight responsibilities.

148. The misrepresentations and omissions in the 2024 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy, including, but not limited to, the reelection of certain Individual Defendants and the ratification of the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

149. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2024 Proxy.

150. As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

151. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together

with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and
- strengthening the Board's internal operational control functions;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 11, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Alex J. Tramontano*
ALEX J. TRAMONTANO

Betsy C. Manifold (182450)
Rachele R. Byrd (190634)
Alex J. Tramontano (276666)
750 B Street, Suite 1820
San Diego, CA 92101

Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Gina M. Serra
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
tjm@rl-legal.com
gms@rl-legal.com

*Attorneys for Plaintiff*

# VERIFICATION

I, Jonathan Allen, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3 __ day of March, 2025.

Signed by:
3BE3CAE3F15D4DE...
Jonathan Allen